IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In re: Lincoln Fire Company,      :
Non-Profit Corporation      :
     :    No. 479 C.D. 2022
Appeal of: Lincoln Fire Company      :    Argued: December 4, 2023

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
           HONORABLE CHRISTINE FIZZANO CANNON, Judge
           HONORABLE ELLEN CEISLER, Judge

OPINION
BY JUDGE FIZZANO CANNON            FILED: January 16, 2024

Lincoln Fire Company (Lincoln or the Company) appeals from the April 15, 2022, order (Trial Court Order) of the Orphans' Court Division of the Court of Common Pleas of Montgomery County (Trial Court) granting, in part, and denying, in part, Lincoln's "Petition for Approval of Asset Transfer Under 15 Pa.C.S. § 5547(b) and Petition for Voluntary Dissolution of Lincoln Fire Company" (Petition), which sought the voluntary dissolution of Lincoln and the distribution of Lincoln's assets to Lincoln's designated beneficiaries. Upon review, we affirm, in part, reverse, in part, and remand the matter for further proceedings in accordance with this opinion.

## I. Factual and Procedural Background

Lincoln, a volunteer firefighting company formed in 1929, is a Pennsylvania 503(c)(3)[1] nonprofit corporation that is exempt from federal taxation.

---

[1] Section 501(c)(3) of the Internal Revenue Code of 1986 (Tax Code), 26 U.S.C. § 501(c)(3).

Trial Ct. Op., June 16, 2022 (Trial Ct. Op.), at 1. Lincoln's Articles of Incorporation from 1929 state that its purpose is "maintenance and support of a company for the preservation of property in the Township of Whitemarsh, County of Montgomery and State of Pennsylvania, and its vicinity, from destruction by fire."[2] Reproduced Record (R.R.) at 3a & 61a. Relevant to this appeal, Lincoln's by-laws state: "In any dissolution of the Company, any surplus remaining after paying or providing for all liabilities shall be distributed to a tax-exempt Volunteer Fire, Ambulance, or other Emergency or Rescue Squad, by decision of the membership." *Id*. at 57a.

On January 6, 2021, Lincoln filed the Petition with the Trial Court requesting both its voluntary dissolution and the approval of its planned asset transfer to designated recipients. R.R. at 61a-64a. The Petition stated that Whitemarsh Township had previously decertified Lincoln and ceased dispatching Lincoln to emergency incidents. *Id.* at 62a. Lincoln's members had therefore voted to dissolve the Company. *Id*. The Petition noted that, in 2019, Lincoln had sold its equipment and property in Whitemarsh Township with the Trial Court's approval and that the proceeds totaling $377,447.93 were in the Company's bank accounts. *Id*. at 62a-63a. Lincoln's membership had elected to distribute the bank accounts, Lincoln's sole remaining asset, in the following percentages: 75% to the

---

[2] Lincoln's constitution likewise states that its objectives are:

> To "maintain fire fighting equipment for the prevention and extinguishment of fires, and maintain the necessary equipment for the provision of [Quick Response Services] (QRS).

> To safeguard life and property, promote fire prevention, provide QRS response and work to advance the efficiency, cooperation and cause of the Volunteer Fire and QRS personnel and their Volunteer Organizations.

Reproduced Record (R.R.) at 45a.

Montgomery County Fire Academy (MCFA), an organization that trains firefighters and emergency medical technicians (EMTs); and 25% to North Penn Goodwill Services (Goodwill), an organization that provides meals and comfort services to firefighters at fire scenes. *Id.* The Petition explained that MCFA trains fire companies in the county "and therefore supports [Lincoln's] general purpose of preservation of property from destruction by fire" in Montgomery County and that Goodwill "provides aid to those responding to and fighting fires." *Id.* at 63a.

Pursuant to Pennsylvania Orphans' Court Rule 4.4, Lincoln sent a copy of the Petition to the Charitable Trusts and Organizations section of the Office of Attorney General (OAG), which has supervisory authority over nonprofits in Pennsylvania and may intervene on behalf of the Commonwealth in any court action involving those entities. R.R. at 80a; *see also* Section 204(c) of the Act of Oct. 15, 1980, P.L. 950, *as amended*, 71 P.S. § 732-204(c). Later that month, OAG filed the "Answer of the Commonwealth of Pennsylvania to the Petition for Approval of Asset Transfer Under 15 Pa.C.S. § 5547(b) and Petition for Voluntary Dissolution of Lincoln Fire Company" (Answer) in its capacity as *parens patriae*. *Id.* at 82a-86a. In the Answer, OAG asserted that the purposes of MCFA and Goodwill were insufficiently similar to Lincoln's and that the distribution of Lincoln's assets to those entities would therefore violate *cy pres* principles[3] as incorporated into Section 7740.3(a)(3) of the Probate, Estates, and Fiduciaries Code.[4] R.R. at 82a-86a; *see also* 20 Pa.C.S. § 7740.3(a)(3) (stating that "if a particular charitable purpose

---

[3] "*Cy pres*" is "[t]he equitable doctrine under which a court reforms a written instrument with a gift to charity as closely to the donor's intention as possible, so that the gift does not fail." *In re Est. of Ryerss*, 987 A.2d 1231, 1237 (Pa. Cmwlth. 2009) (quoting Black's Law Dictionary 392 (7th ed. 1999)).

[4] 20 Pa.C.S. §§ 7701-7799.3.

becomes unlawful, impracticable or wasteful . . . the court shall apply *cy pres* to fulfill as nearly as possible the settlor's charitable intention, whether it be general or specific"). In addition to requesting the denial of the Petition, the Answer's Wherefore Clause further requested that the Trial Court "apply *cy pres* to fulfill as nearly as possible [Lincoln's] original charitable purpose of 'maintenance and support of a company for the preservation of property in the township of Whitemarsh[,] County of Montgomery[,] and State of Pennsylvania, and its vicinity, from destruction by fire.'" R.R. at 85a-86a.

The Trial Court conducted a hearing on January 26, 2022. R.R. at 90a. Donna Sesko (Sesko),[5] Lincoln's current financial officer, testified that, during her years with Lincoln, she has been involved in multiple fundraising efforts where members provided their time and donated supplies and that all proceeds went to the Company. *Id*. at 96-98a. Sesko explained that, at the time of her testimony, Lincoln had approximately $365,000 in the bank from the sale of its property and equipment, most of the proceeds of which sales went to the costs of retiring outstanding loans thereon. *Id*. at 100a-01a. Sesko further explained that donations received during the Company's winding down period had been returned to the donors. *Id*. at 101a.

During cross-examination, Sesko acknowledged that Lincoln received an annual allotment from Whitemarsh Township, which OAG counsel indicated totaled $718,000 since 2009; the Whitemarsh Township allotment ceased in 2016, when the Company began winding down. R.R. at 103a & 107a. While Lincoln was operating, the Whitemarsh Township allotment furnished less than 25% of Lincoln's

---

[5] Sesko has been involved with Lincoln, which she describes as her "second family," since 1987; she began as a firefighter and EMT, became part of the leadership board in 2015, and took on financial duties in 2018 as Lincoln was winding down. R.R. at 94a-95a & 98a-99a.

4

expenses necessary to maintain its property and equipment and to train personnel. *Id*. at 107a. Sesko also stated that persons from outside Whitemarsh Township attended and contributed to some of Lincoln's fundraising activities and that donors knew that their funds went to the Company. *Id*. at 108a-09a. Sesko did not know how the money was originally raised to buy Lincoln's property 75-80 years ago. *Id*. at 105a.

Jeff Fisher (Fisher), Lincoln's current board secretary,[6] testified that the majority of the Company's membership – 30 to 40 people – met in January 2019 to discuss the disposition of Lincoln's assets as it was winding down. R.R. at 115a. The Company's Board of Directors (Board) had come up with several suggested destinations for the distribution of Lincoln's assets and asked if any members had suggestions. *Id*. at 116a. The Board suggested MCFA and Goodwill as asset recipients because those groups serve the fire and EMT community of Whitemarsh Township and environs and would "hopefully carry on Lincoln's name a little bit." *Id*. at 117a. Lincoln's membership discussed the various options and ultimately agreed with the Board that MCFA and Goodwill were suitable recipients that would help the fire and EMT community in Whitemarsh Township and surrounding areas. *Id*. at 118a. The membership agreed that MCFA serves the entire area by training firefighters and EMTs and that Goodwill serves area firefighters with on-site meals and comfort support. *Id.* at 120a. MCFA and Goodwill had indicated to the Board that they would use the funds for equipment upgrades and maintenance. *Id*.

---

[6] Fisher's family has been involved with the Company for four generations; he personally started with Lincoln in 2000 as a firefighter and has held various positions on both the fire service and leadership sides. R.R. at 11a-12a.

5

Fisher further testified that the Company's membership "overwhelmingly" voted against the distribution of Lincoln's assets to Whitemarsh Township's two remaining volunteer fire companies – Spring Mill Fire Company No. 1 (Spring Mill) and Barren Hill Fire Company (Barren Hill) – because, when Lincoln faced decertification by Whitemarsh Township, those fire companies had not helped, but had instead, it was believed, surreptitiously contributed to Lincoln's demise. R.R. at 119a. Fisher acknowledged a rivalry between Lincoln and the local fire companies existed in past years, but explained that Lincoln's membership believed the other companies' members had acted in a manner not befitting the "brotherhood" ethos of firefighters during the process of Lincoln's decertification. *Id.*

On cross-examination, Fisher confirmed that Lincoln's by-laws state that, in the event of a dissolution, Lincoln's assets would go to a "tax-exempt volunteer fire, ambulance, or other emergency or rescue squad." R.R. at 121a. Fisher acknowledged that MCFA does not fit that description and that Goodwill may not either. *Id.* at 122a. He also acknowledged that neither entity is solely focused on Whitemarsh Township. *Id.* Fisher maintained, however, that these entities served Lincoln's general constitutional purposes of safeguarding life and property, promoting fire prevention, and advancing the efficiency, cooperation, and cause of volunteer firefighting and EMT services. *Id.* at 123a-24a.

Thomas Garrity (Garrity), MCFA's director, testified that MCFA is located about a mile outside of Whitemarsh Township, in Conshohocken. R.R. at 126a. Garrity explained that MCFA's mission is to train volunteer firefighters and EMTs throughout Montgomery County to national standards. *Id.* at 127a-28a. Garrity testified that MCFA is tax-exempt and funded by Montgomery County, but

6

does receive occasional donations, the funds from which are deposited with Montgomery County, but available for MCFA's use, as needed. *Id*. at 129a-31a. Garrity explained that MCFA intends to use Lincoln's contribution to upgrade its auditorium and kitchen, which serves lunch to students during classes and that a plaque with Lincoln's name will be put up in the facility to commemorate the contribution. *Id*. at 130a-31a. Garrity further testified that, while MCFA charges for its training, it operates at a loss; training tuition brings in only about $200,000 of a total $1.4 million operating budget, with Montgomery County making up the difference. *Id*. at 132a-34a. Garrity did not believe that he could restrict funds from Lincoln to be directed solely to training Whitemarsh firefighters and EMTs. *Id*. at 135a.

Goodwill's president, James Thomas (Thomas), testified that Goodwill is a "canteen service" that provides food and comfort services free of charge to firefighters and EMTs at fire and/or emergency sites. R.R. at 139a. Thomas explained that Goodwill is located and operates in Montgomery County, but also serves nearly all areas surrounding Philadelphia, including southern New Jersey. *Id*. at 140a & 142a-43a. All of Goodwill's funding comes from donations and fundraisers. *Id*. at 140a. Thomas stated that Goodwill intends to use the funds received from Lincoln to upgrade its facilities, buy another service truck, and pay down the financing on another recently purchased truck. *Id*. at 141a-42a. Thomas confirmed that Goodwill is not a firefighting or rescue entity but stated that Goodwill helps such entities indirectly by supporting firefighters and EMTs at fire, emergency, and disaster scenes. *Id*. at 143a-45a.

OAG presented the testimony of Barren Hill's Chief, Christopher Schwartz (Schwartz).[7] R.R. at 149a.[8] Schwartz testified that Barren Hill is a charitable, 503(c)(3) volunteer fire company located at 647 Germantown Pike, Whitemarsh Township, Montgomery County. *Id.* at 154a & 157a-58a. He explained that Barren Hill provides all facets of firefighting and rescue services from approximately the 2200 block north through Pennsylvania Avenue in Whitemarsh Township and provides mutual aid to other first responders in every municipality bordering Whitemarsh Township. *Id.* at 154a. He explained that Barren Hill participates in education programs in local schools and throughout the community. *Id.* at 154a-55a. According to Schwartz, Barren Hill handles approximately 40 to 50 fire and emergency calls per month, with the majority of the calls originating in Whitemarsh Township. *Id.* at 155a. Schwartz further explained that, in 2016 when it decided to decertify Lincoln, Whitemarsh Township requested that Barren Hill add certain geographic areas amounting to approximately 15-20% of Lincoln's coverage area to Barren Hill's coverage area. *Id.* at 156a-57a. Barren Hill agreed and has been covering the requested areas since that time. *Id.* at 157a. Schwartz

[7] A police officer since 2003, Schwartz is currently a detective sergeant with the Plymouth Township Police, Montgomery County. R.R. at 153a. He has been a volunteer firefighter at Barren Hill since 1998. *Id.* Schwartz was a Barren Hill lieutenant in the mid-2000s before being elected Chief in 2008. *Id.* at 153a-54a. He has in the past held the position of Barren Hill's treasurer and also served on its board of trustees for a three-year period. *Id.* at 154a.

[8] We observe that at the beginning of Schwartz's testimony, Lincoln's counsel objected to the testimony as irrelevant, as the hearing was "not a *cy pres* proceeding," but instead solely for the purpose of presenting Lincoln's wishes in the Petition regarding the distribution of its assets. R.R. at 149a-50a. As such, Lincoln argued that, if the Trial Court denied Lincoln's proposed distribution, then Lincoln should have the opportunity to select alternative recipients and present them at a future proceeding focused specifically on *cy pres* matters. *Id.* The Trial Court declined to bifurcate the proceedings at that time and allowed Schwartz to testify. *Id*. at 151a-52a.

8

further explained that Barren Hill would employ any money awarded from Lincoln's assets to further Barren Hill's mission[9] with respect to operational and prevention services provided to Whitemarsh Township. *Id.* at 158a. He also repeatedly explained that no discussion of merging fire companies ever occurred between Barren Hill and Lincoln during the process of Lincoln's decertification by Whitemarsh Township. *Id.* at 162a-64a & 166a-67a.

OAG also presented the testimony of Spring Mill Chief Wayne Masters[10] before the Trial Court. Masters testified that Spring Mill is a tax-exempt 503(c)(4)[11] organization located at 1210 East Hector Street, Conshohocken, which is situated within Whitemarsh Township. R.R. at 170a & 173a-74a. Masters explained that Spring Mill provides the southeastern portion of Whitemarsh

---

[9] Schwartz testified that Article II, Section 1 of Barren Hill's by-laws accurately describes Barren Hill's purpose and mission. R.R. at 156a. Article II, Section 1 of those by-laws provides:

> [Barren Hill's] purpose shall be for the acquisition, support and maintenance of fire apparatus and other pertinent equipment for the prevention, control and extinguishment of fires and for other emergencies in Whitemarsh Township and other areas where needed. The organization is organized exclusively for charitable, educational, or scientific purposes under section 501(c)(3) of the Internal Revenue Code, or corresponding section of any future tax code.

R.R. at 156a; *see also* Barren Hill By-Laws, R.R. at 9a.

[10] Masters is vice president of sales for 911 Marketing and current fire chief of Spring Mill. R.R. at 169a. He joined Spring Mill in 1998. R.R. at 169a. In addition to service as Chief, Masters held the positions of lieutenant, captain, assistant chief, deputy chief, and president. R.R. at 169a. He also has served on Spring Mill's board of directors for multiple years. *Id.*

[11] Section 501(c)(4) of the Tax Code, 26 U.S.C. § 501(c)(4).

9

Township with fire, rescue, water rescue, and EMS services.[12]  *Id.* at 170a.  Spring Mill averages approximately 20 calls per month.  *Id.* at 171a.  Masters further explained that, when it decided to decertify Lincoln in 2016, Whitemarsh Township requested that Spring Mill add certain geographic areas amounting to approximately 75% of Lincoln's coverage area to Spring Mill's coverage area, and Spring Mill agreed.  *Id.* at 172a-73a.  Masters explained that, if awarded a portion of Lincoln's assets, Spring Mill would use the funds to manage significant debt resulting from the maintenance of its building and equipment purchases as well as helping to manage operating expenses.  *Id.* at 174a.  Masters further testified that no attempts were made by either Spring Mill or Lincoln to merge operations when Whitemarsh Township decertified Lincoln.  *Id.* at 176a.

By order dated April 15, 2022, the Trial Court granted the Petition to the extent it sought Lincoln's voluntary dissolution, denied the Petition to the extent it requested approval to transfer Lincoln's assets to MCFA and Goodwill, and directed the distribution of Lincoln's assets instead to Barren Hill and Spring Mill, in accordance with the recommendation of the OAG on behalf of the Commonwealth as *parens patriae*.  Lincoln filed a Motion for Reconsideration on April 25, 2022, to

---

[12] Masters explained that Spring Mills' constitution accurately describes its purpose and mission as:

> The object for which this [c]ompany is formed is the maintenance of a society for the protection of life and property, the prevention and extinguishment of fires and any other emergencies that may require our assistance along with taking such steps in investigation thereof as may be deemed advisable, as well as the business functions of the organization.

R.R. 171a-72a; *see also* Spring Mill constitution, R.R. at 23a.

which OAG filed an Answer on May 9, 2022, and which the Trial Court denied by order dated May 10, 2022. *See* R.R. at 221a-32a. Lincoln appealed to this Court.

## II. Issues

On appeal,[13] Lincoln claims the Trial Court erred by denying, through the application of *cy pres*, the transfer of Lincoln's assets upon dissolution to its chosen beneficiaries. *See* Lincoln Br. at 6 & 11-14. Lincoln argues that *cy pres* is inapplicable to the instant matter and was not before the Trial Court where the Petition did not assert *cy pres*. *See id.* at 6 & 15-22. Finally, Lincoln argues that, if *cy pres* was applicable, the Trial Court erred by failing to provide Lincoln an opportunity to present additional evidence and/or alternative beneficiary suggestions. *See id.* at 6-7 & 22-24.

## III. Discussion

Section 5547(b) of the Pennsylvania Nonprofit Corporation Law of 1988[14] provides that

> [p]roperty committed to charitable purposes shall not, by any proceeding under Chapter 3 (relating to entity transactions) or 59 (relating to amendments, sale of assets and dissolution) or otherwise, be diverted from the objects to which it was donated, granted or devised, unless and until the board of directors or other body obtains from the court an order under 20 Pa.C.S. Ch. 77 (relating to trusts) specifying the disposition of the property.

---

[13] "This Court's standard of review is limited to considering whether the trial court, sitting as a chancellor in equity, committed an error of law or abused its discretion." *Williams Twp. Bd. of Supervisors v. Williams Twp. Emergency Co.*, 986 A.2d 914, 920 n.4 (Pa. Cmwlth. 2009).

[14] 15 Pa.C.S. §§ 5101-6146.

11

15 Pa.C.S. § 5547(b).  Regarding the distribution of assets of dissolved charities, Section 7740.3 of Pennsylvania's Uniform Trust Act[15] provides, in relevant part:

> **(a) General rule.--**Except as otherwise provided in subsection (b),[16] if a particular charitable purpose becomes unlawful, impracticable or wasteful:
>
> > (1) the trust does not fail, in whole or in part;
> >
> > (2) the trust property does not revert to the settlor or the settlor's successors in interest; and
> >
> > (3) the court shall apply *cy pres* to fulfill as nearly as possible the settlor's charitable intention, whether it be general or specific.

20 Pa.C.S. § 7740.3(a).[17]  As this Court has observed:

> Application of the doctrine of *cy pres* requires a court to exercise its discretion in such manner as to award funds to charity, which most resembles the one that settlor intended to benefit, and, thus, it is necessary to examine [1] the purposes and objects of that charity, [2] the locality that charity intended to serve, and [3] the nature of the

---

[15] 20 Pa.C.S. §§ 7701-7799.3.

[16] Subsection (b) of Section 7740.3 provides an exception not in effect in the instant matter whereby the specific terms of a charitable trust may allow for distribution of trust assets to a noncharitable beneficiary in lieu of a court's application of *cy pres* as directed in subsection 7740.3(a)(3).  *See* 20 Pa.C.S. § 7740.3(b) (noting an exception to 20 Pa.C.S. § 7740.3(a) where "[a] provision in the terms of a charitable trust that would result in distribution of the trust property to a noncharitable beneficiary prevails over the power of the court under subsection (a) to apply *cy pres*.").

[17] As the Comment to Section 7740.3 explains, "[t]he doctrine of *cy pres* is applied not only to trusts, but also to other types of charitable dispositions, including those to charitable corporations." 20 Pa.C.S. § 7740.3, Comment.

population that was the intended object of the charitable gift.

*Commonwealth by Kane v. New Founds., Inc.*, 182 A.3d 1059, 1073 n.8 (Pa. Cmwlth. 2018).

The Trial Court found in the instant matter that Lincoln's intended beneficiaries of its assets upon dissolution were not appropriate. *See* Trial Ct. Op. at 5-7. The Trial Court explained:

> It is uncontested that Lincoln's operations have ceased, and it is no longer able to fulfill its stated charitable purpose. Contrary to its request for approval, however, the missions [of] the two entities to which it sought distribution, [MCFA] and [Goodwill], are not the closest possible fit to Lincoln's charitable mission, and therefore, not appropriate.
>
> The mission of [MCFA] is materially different from Lincoln's mission. While Lincoln's mission is to provide a fire company that responds to and fights fires in Whitemarsh Township and surrounding areas, [MCFA's mission] is to provide training for fire, rescue and emergency medical services in Montgomery County. Even a cursory review of Lincoln's [b]y-[l]aws[] demonstrates that [MCFA], whose purpose is education and[,] therefore, much broader than that of Lincoln, is not an appropriate recipient. In relevant part, the dissolution clause of Lincoln's [b]y-[l]aws expressly states that "[i]n any dissolution of the Company, any surplus remaining after payout or providing for all liabilities shall be distributed to a tax-exempt Volunteer Fire, Ambulance, or other Emergency or Rescue Squad . . . ."
>
> The mission of Lincoln's other proposed distributee, [Goodwill], renders it a similarly inappropriate entity to receive Lincoln's assets. [Goodwill's] mission is ["]to provide hot food, hot and cold drinks, temporary shelter

from the elements, and a restroom facility to emergency workers including police, firefighters and rescue personnel." It is uncontested that [Goodwill] does not fight fires or preserve property, but instead is limited to supporting those that do by providing food, beverages, shelter, and restroom accommodations. As such, [Goodwill's] mission [is] supportive, rather than dedicated to the front line fire fighting for which Lincoln existed.

Contrary to Lincoln's assertions, the record reflects that the entities to which it sought distribution of its assets do no[t] provide direct services to prevent the destruction of property by fire, and therefore were not appropriate.

Trial Ct. Op. at 5-6 (footnote omitted).

We find no error of law or abuse of discretion in the Trial Court's determination that MCFA and Goodwill were not appropriate organizations to fulfill Lincoln's purpose of maintaining and supporting a fire company for the preservation of property in Whitemarsh Township and its vicinity from destruction by fire.[18] MCFA is an educational outfit that provides training for fire, rescue, and emergency medical services in Montgomery County. Goodwill is a canteen service that supports fire companies. Neither is a fire company dedicated to preserving property in Whitemarsh Township and its vicinity, the purpose stated in Lincoln's Articles of

---

[18] Our Supreme Court has explained that although a nonprofit corporation's actions must be related to its corporate purpose, that purpose and the corporation's authority to take action under it "must be construed in the least restrictive way possible, limiting the amount of court interference and second-guessing . . . ." *Zampogna v. Law Enforcement Health Benefits, Inc.*, 151 A.3d 1003, 1023 (Pa. 2016); *see also In re Indep. Fire Co. No. 1* (Pa. Cmwlth., No. 1489 C.D. 2018, filed Feb. 5, 2020), slip op. at 12 n.10 (quoting *Zampogna* in a case relating to the distribution of fire company assets). Arguably, the Trial Court was unduly narrow in its construction of Lincoln's purpose and its authority to distribute its assets consistent with that purpose. However, we need not decide that issue because, in any event, Lincoln's by-laws expressly limit its distribution of assets upon dissolution to a "tax-exempt volunteer fire company, ambulance, or other emergency or rescue squad." R.R. at 121a.

14

Incorporation. Accordingly, we find no error in the Trial Court's disapproval of Lincoln's designation of these entities as beneficiaries of Lincoln's remaining assets.

However, while the Trial Court did not err by denying distribution of Lincoln's remaining assets to its designated beneficiaries, this does not mean that the Trial Court was authorized, in deciding the Petition, to direct the distribution of Lincoln's remaining assets to OAG's suggested alternative beneficiaries. This is not a traditional *cy pres* situation where a charitable organization is defunct or being involuntarily dissolved pursuant to a petition filed by OAG. Instead, the instant matter involves the determination of a petition filed by an extant fire company for the approval of its designated beneficiaries as part of the process of the voluntary dissolution of that fire company, the members of which are available and willing to direct the distribution of the organization's remaining assets prior to the completion of the voluntary dissolution pursuant to the organization's by-laws. Clearly, by virtue of having voted upon intended beneficiary organizations and filing the instant Petition, Lincoln's members have a continuing desire to direct the distribution of Lincoln's assets and are taking appropriate steps to do so pursuant to procedures outlined in Lincoln's by-laws. Under such circumstances, the Trial Court need not resort to the application of *cy pres* to distribute a charitable organization's remaining assets absent a showing that the organization is either unwilling or unable to identify suitable recipients on its own accord. *See Lacey Park Volunteer Fire Company No. 1 v. Board of Supervisors of Warminster Township*, 365 A.2d 880 (Pa. Cmwlth. 1976) (noting that decertified fire company retained ownership of property in its possession and had legal authority to determine the future of those assets); *see also In Re Merger of Universal Volunteer Fire Department Into Point Breeze Volunteer Fire Association*, 235 A.3d 415 (Pa. Cmwlth. 2020) (finding that fire company's

15

decertification did not trigger the application of the *cy pres* doctrine for the purpose of distributing fire company's remaining assets).

Lincoln's Articles of Incorporation clearly state that Lincoln's purpose is the maintenance and support of a fire company for the preservation of property in Whitemarsh Township, and its vicinity, from destruction by fire. *See* R.R. at 3a & 61a. Additionally, Lincoln's by-laws provide that, in the event of dissolution, the distribution of Lincoln's remaining assets shall be decided by Lincoln's membership. *See* R.R. at 57a. While the Trial Court maintains power under Section 5547(b) of the Pennsylvania Nonprofit Corporation Law of 1988, 15 Pa.C.S. § 5547(b), and Section 7740.3 of the Uniform Trust Act, 20 Pa.C.S. § 7740.3(a), to review Lincoln's chosen intended beneficiaries to ensure that such beneficiaries sufficiently comport with Lincoln's stated charitable purpose, the Trial Court lacked the authority to mandate, without further process, OAG's alternative selections on the membership of Lincoln, a still-extant charitable organization. In addition to OAG's proposed recipients (Spring Mill and Barren Hill), Lincoln identified six other area fire companies that may be appropriate recipients of its remaining assets.[19] *See* Lincoln's Br. at 23; *see also* Lincoln Fire Company's Motion for Reconsideration, R.R. at 224a. If Lincoln can prove that these fire companies are dedicated to the protection of property from destruction by fire and are also "in the vicinity" of Whitemarsh Township, then presumably any one of them would satisfy the requirements of Lincoln's Articles of Incorporation without need on the part of the Trial Court to either resort to OAG's suggested alternative beneficiaries or apply *cy*

---

[19] The additional alternative fire companies listed by Lincoln include Conshohocken Fire Company, Plymouth Fire Company, Harmonville Fire Company, Fort Washington Fire Company, Flourtown Fire Company, and George Clay Fire Company. *See* Lincoln's Br. at 23; *see also* Lincoln Fire Company's Motion for Reconsideration, R.R. at 224a.

*pres*. Nothing in Lincoln's by-laws indicate that its membership would only have one shot to direct the distribution of its assets upon dissolution. Likewise, nothing in either Section 5547(b) of the Pennsylvania Nonprofit Corporation Law of 1988, 15 Pa.C.S. § 5547(b), or Section 7740.3 of the Uniform Trust Act, 20 Pa.C.S. § 7740.3(a), requires such a result or provides a trial court with authority to apply *cy pres* to require an extant charitable organization to accept the asset distribution suggestions of OAG without further opportunity to forward its own alternative asset distributees following a denial of the charitable organization's initial proposed asset distributees. Determining otherwise would effectively allow a taking of Lincoln's assets without due process. *See Lacey Park*. There was no indication that Lincoln could not fulfill its obligation to designate alternate, appropriate asset transferees in order to complete its dissolution. Therefore, we find that the Trial Court erred by applying *cy pres* principles and directing the distribution of Lincoln's remaining assets to the organizations suggested by OAG without providing Lincoln's membership further opportunity to identify and select a distributee or distributees on its own.

We are also not convinced by the Trial Court's suggestion that it was authorized to apply *cy pres* to determine the distribution of Lincoln's assets because Lincoln was on notice of the applicability of the *cy pres* doctrine and had been granted an opportunity to be heard thereon by virtue of the nature of the Petition and OAG's response thereto. *See* Trial Ct. Op. at 7-8. Lincoln's Petition sought *only* the Trial Court's approval of Lincoln's designated beneficiaries; it did not request the Trial Court's application of *cy pres* as an alternative in the event the Trial Court disapproved of Lincoln's intended beneficiaries. Further, while OAG specifically denied in its Answer that Lincoln's suggested beneficiaries were proper because neither was a fire company dedicated to fighting fires in Whitemarsh Township,

17

OAG did not file a *cy pres* petition in this matter.[20]  Accordingly, the only decision before the Court during the hearing on this matter was the propriety of Lincoln's designated beneficiaries, not the identification or approval of other, alternative beneficiaries.  The application of *cy pres* to make such a determination required OAG to file a petition for such a determination, which petition Lincoln would then have had an opportunity to formally contest.  *See In re Independent Fire Company No. 1* (Pa. Cmwlth., No. 1489 C.D. 2018, filed Feb. 5, 2020)[21] (involving trial court review of a petition filed by OAG seeking a fire company's involuntary dissolution and the distribution of the fire company's remaining assets pursuant to the *cy pres* doctrine).  The Trial Court's suggestion that the deprivation of Lincoln's opportunity to suggest alternative recipients resulted from Lincoln's own litigation strategy, which the Trial Court characterized as "turn[ing] a blind eye and forg[ing] ahead despite the repeated attestations of the Commonwealth, as *parens patriae*, as to Lincoln's proffered distributes[,]" is simply incorrect.  Trial Ct. Op. at 8.  Lincoln filed the Petition seeking approval of its designees.  The OAG opposed those designees in its Answer to the Petition and throughout the Petition hearing.  Although it would have been a sensible and logical subject of an OAG petition to be filed following the Trial Court's resolution/determination of the Petition, the

---

[20] The OAG's answer to the Petition recited the statutory *cy pres* provision and included a conclusory *cy pres* request in its prayer for relief.  However, that was insufficient to substitute for an affirmative filing, such as a petition, which would have required the OAG to establish the requisite conditions for the doctrine's application.  Notably, the OAG did not assert any facts that arguably would have triggered the application of the *cy pres* doctrine, specifically Lincoln's inability to fulfill its charitable purpose by voting to designate a different fire company, ambulance, or rescue squad as the transferee of its assets.  The OAG likewise offered no such averments or evidence at the hearing.

[21] Pursuant to Commonwealth Court Internal Operating Procedure 414(a), 210 Pa. Code § 69.414(a), unreported panel decisions of this Court, issued after January 15, 2008, may be cited for their persuasive value.

18

application of *cy pres* to distribute Lincoln's assets in the event the Trial Court disapproved of the beneficiaries put forth in the Petition was simply not an issue in the prosecution of the Petition. The Trial Court erred by applying *cy pres* without a pending petition seeking application of the same.

Accordingly, for all of these reasons, we conclude that the *cy pres* doctrine is not applicable in this case. Additionally, based on the above discussion, we find the Trial Court's grant of the Petition to the extent it requested Lincoln's voluntary dissolution to have been premature.

## IV. Conclusion

For the above reasons, we affirm the Trial Court Order to the extent it denied the distribution of Lincoln's assets to MCFA and Goodwill but reverse the Trial Court Order to the extent it granted Lincoln's voluntary dissolution and directed distribution of Lincoln's remaining assets to Spring Mill and Barren Hill.

The matter is remanded to the Trial Court for further proceedings consistent with this opinion.

_____
CHRISTINE FIZZANO CANNON, Judge

19

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In re: Lincoln Fire Company,      :
Non-Profit Corporation        :
                                  :   No. 479 C.D. 2022
Appeal of: Lincoln Fire Company   :

## O R D E R

AND NOW, this 16th day of January, 2024, the April 15, 2022, order (Trial Court Order) of the Orphans' Court Division of the Court of Common Pleas of Montgomery County (Trial Court) is AFFIRMED to the extent it denied the distribution of Lincoln Fire Company's (Lincoln) remaining assets to Montgomery County Fire Academy and North Penn Goodwill Services. The Trial Court Order is REVERSED to the extent it granted Lincoln's voluntary dissolution and directed distribution of Lincoln's remaining assets to Spring Mill Fire Company No. 1 and Barren Hill Fire Company. The matter is REMANDED to the Trial Court for further proceedings.

Jurisdiction relinquished.

_____
CHRISTINE FIZZANO CANNON, Judge